877 So.2d 1027 (2004)
STATE of Louisiana, Appellee
v.
Walter MOORE, Jr., Appellant.
No. 38,444-KA.
Court of Appeal of Louisiana, Second Circuit.
June 23, 2004.
Rehearing Denied August 12, 2004.
*1030 Burnes, Burnes & Talley, by Dmitrc I. Burnes, Alexandria, E. Roland Charles, Louis Granderson Scott, for Appellant.
Jerry L. Jones, District Attorney, Charles L. Brumfield, Assistant District Attorney, for Appellee.
Before CARAWAY, PEATROSS and DREW, JJ.
DREW, J.
Walter Moore, Jr., was convicted of second degree murder and sentenced to life imprisonment, without benefit of probation, parole, or suspension of sentence. We affirm his conviction and sentence.

FACTS
In the early morning hours of November 4, 1999, John William Gaines was found shot to death in his Bastrop liquor store.[1] The police had gone to investigate when Gaines failed to come home after the store's scheduled 11:00 p.m. closing. The victim was found face down on the floor behind the store counter, with a single bullet wound to his head. He had been killed, execution style, while lying on the floor. The autopsy revealed that the gun was fired approximately one and a half feet from the back of Gaines' head. A spent 9-millimeter shell casing was found on the floor next to his head. Money and merchandise were missing from the store, along with a Ruger revolver. The interior security video cameras had been destroyed and the tapes removed. The police found the imprint of a shoe on a white sheet of paper found on the floor of the store. Various items were checked for fingerprints, but no usable prints were found.
Later that morning, Alticia Hawkins told the officers that the night before, as she had gone through the drive-through near closing time, she saw Johnny Williams and the defendant standing behind the liquor store. Hawkins knew both men, and said hello to them, thinking that they were acting very suspiciously. At the time, both men were wearing sweater caps. As she watched the two, she felt like something bad was about to happen, *1031 but did not tell the person waiting on her, nor the police. When she heard the next morning that Gaines had been shot, she then called the police.
An employee of the liquor store, Eric Wheeler, testified that he saw Moore come to the store several times on November 3, 1999, including once as a passenger in a car that pulled through the drive-through. Wheeler did not know the driver, though he knew the defendant and chatted with him. Moore asked Wheeler when he was getting off work, and if he wanted to go out, promising to come pick him up. Though Wheeler got off work at 9:00 p.m. and promptly went home, he never saw the defendant again that night.
Later on November 4, 1999, the police took both suspects into custody. The defendant did not give a statement to the police. Williams confessed, however, telling the officers that:
 He and Moore met and planned the robbery.
 They bought a blue duffle bag from Wal-Mart.
 They wore stocking-ski-mask caps and gloves.
 Moore was armed with a 9-millimeter caliber pistol.
 When they entered the store, he locked the door as Moore confronted Gaines.
 Williams was supposed to go into the office and retrieve the video security tapes.
 While in the office for that purpose, Williams heard a gunshot.
 When he ran back into the store, he saw Gaines face down on the floor.
 He and the defendant stuffed the cash into a blue duffle bag, along with three security tapes and merchandise.
 Moore told him that he shot Gaines because the victim had recognized him.
 They fled to an abandoned house on Birch Street, where they hid the bag.
 They then went a short distance to the home of Williams' girlfriend, Nicole Burrell.
 Williams gave some of his share of the money to Burrell.
Ms. Burrell testified that:
 The two came to her home about 11:30 p.m.
 Moore was wearing the ski mask cap.
 They had a lot of money which they advised came from a liquor store robbery.
 Moore told her that he had shot a man in the back of the head and killed him.
 She did not receive any of the money.
In a macabre twist, Moore apparently took the three video tapes home for viewing. The two hid the masks and Williams' shoes in a wooded area in Burrell's back yard. Thereafter, the two men split up.
After Williams and Moore were arrested for the first degree murder of Gaines, Williams took the police to an abandoned house in the neighborhood where he and Moore lived.[2] The police found and seized a blue duffle bag filled with stolen liquor and cigarettes, a 9-millimeter pistol, and the stolen Ruger revolver. Subsequent forensic testing established that the 9-millimeter pistol, which had been stolen in Baton Rouge, was the weapon used to kill Gaines.
At Williams' house, inside a night stand, the police found $555.00 in cash hidden in an empty VHS video box.
In a wooded area behind the residence of Nicole Burrell, the police found a pair of *1032 Nike tennis shoes and a black ski mask cap. Williams admitted that the shoes belonged to him. The shoes were later identified as the ones that made the impression on the paper found at the murder scene. The cap was sent to the crime lab for DNA testing. A DNA sample was retrieved at the lab from saliva found in the mouth area of the stocking cap.
Williams told the officers that the defendant had hidden the stolen surveillance tapes at 806 Washington, where the defendant lived with his mother. The police searched the home on the afternoon of November 4, 1999. In this first search, the police did not find any incriminating evidence. Four days later, on November 8, 1999, the police conducted a second search of the Moore home, whereupon the tapes were found. The tapes did not show the robbery and murder.
Williams agreed to testify against the defendant in exchange for his being allowed to plead guilty to the reduced charge of armed robbery.[3]
The charge against Moore was subsequently reduced to second degree murder, for which crime he was convicted at jury trial.
The state sought to introduce the DNA evidence to prove that the DNA found on the ski mask matched the defendant's DNA. The defendant objected, asserting the DNA testing results were inadmissible because the state obtained a warrant for the DNA testing, and obtained DNA samples from the defendant, without a contradictory hearing or any notice to defendant's counsel. The trial court correctly found that neither notice nor a contradictory hearing was required. The trial court also found that the defendant did not file a motion to suppress, and therefore had failed to properly preserve this issue.
Defendant's mother, Zandria Moore, testified that:
 On the night of November 3, 1999, the defendant was not home when she went to bed around 8:30 to 9:00 p.m.
 When she got up briefly around 1:00 a.m., she checked on the defendant, who was asleep in his bed.
 The defendant was still in bed asleep when she left the house the next morning.
 When she returned home, she found the defendant still asleep, while Johnny Williams was sitting in the defendant's bedroom, watching cartoons.
 She asked Williams what he was doing in her house.
 He apologized and left.
 She woke the defendant to determine if he was going to work, to which he replied in the negative.
 On November 4, 1999, the defendant did not appear to be nervous or frightened.
 When the officers found the video tapes in the laundry room, they put them in her VCR to play.
 Between November 4 and 9, 1999, there were times that nobody was in her home.
The defendant's father, Walter Moore, Sr., testified that:
 As he was leaving his house on the morning of November 4, 1999, the defendant was in his bed sleeping.
 As he drove off, he saw Johnny Williams coming up the sidewalk.
 He did not know his son had been arrested until he returned home from *1033 work, when the police came to the door with a search warrant.
 The police searched the entire house, including the laundry room.
 The house rule was that the defendant could have none of his male friends in the house.
On numerous occasions during the trial, the trial court held conferences with counsel, both in chambers and in court, regarding the jury charge. The skill and patience of the trial court is noted and appreciated. The prosecutor and defense counsel negotiated the final jury charge, under the careful guidance and supervision of the trial court, whereupon:
 It was agreed to simplify the definition of second degree felony murder by eliminating all of the enumerated felonies other than armed robbery; and
 The jury charge as to felony manslaughter was amended to more simply read, in part:
"... that the killing took place while the defendant was engaged in the perpetration or attempted perpetration of any felony not enumerated under the Second Degree Murder Statute or of any intentional misdemeanor directly affecting the person even though he had no intent to kill or to inflict great bodily harm."
After the defendant concluded with his witnesses, the trial court again held a charge conference to determine if the state and the defendant agreed with the language of the jury charge. Both the state and the defendant again consented to the jury instructions.
After beginning deliberations, the jury sent the trial court a note, asking for the transcripts of statements made by the defendant or Johnny Williams. After being advised of this request, the defendant moved for a mistrial, arguing the jury was not able to fulfill its obligation to not consider the defendant's post-arrest silence. The defendant's motion was denied. The trial court declined to provide any transcripts or statements to the jury.
The jury found the defendant guilty of second degree murder. The trial court ordered a pre-sentence investigation report, denied motions for post-verdict judgment of acquittal and for new trial, and sentenced the defendant to life imprisonment, without benefit of probation, parole, or suspension of sentence. This appeal followed.

DISCUSSION

I. Denial of a motion for mistrial based on the jury adversely considering defendant's decision not to testify
The defendant argues that the jury improperly considered his silence at trial, as demonstrated by the jury's request for copies of any statements by him and Johnny Williams. The state argues that:
 The jury did not ask for testimony, but for any pre-trial statements.
 The reason for this request is unknown, but does not indicate any prejudicial conduct by the jury.
 The jury's request was properly denied, as per La. C. Cr. P. art. 793.
La. Const. art. 1, § 16, provides, in pertinent part, "[n]o person shall be compelled to give evidence against himself."
La. C. Cr. P. art. 775 provides:
A mistrial may be ordered, and in a jury case the jury dismissed, when:
(1) The defendant consents thereto;
(2) The jury is unable to agree upon a verdict;
3) There is a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law;
(4) The court finds that the defendant does not have the mental capacity to proceed;

*1034 (5) It is physically impossible to proceed with the trial in conformity with law; or
(6) False statements of a juror on voir dire prevent a fair trial.
Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771.
A mistrial shall be ordered, and in a jury case the jury dismissed, when the state and the defendant jointly move for a mistrial.
The defendant cites no other evidence, besides the jury request, and provides this court with no jurisprudence supporting his argument. Clearly, the trial court properly dealt with and denied the jury's request.
The ordering of a mistrial is a drastic remedy and, except in instances in which it is mandatory, is only warranted if substantial prejudice results which deprives defendant of a fair trial. State v. Burdgess, 434 So.2d 1062 (La.1983); State v. Sepulvado, 367 So.2d 762 (La.1979); State v. Warren, 28,889 (La.App.2d Cir.12/11/96), 712 So.2d 500. Moreover, the trial court's rulings with regard to trial conduct should not be disturbed absent a manifest abuse of discretion. State v. Warren, supra; State v. Deboue, 496 So.2d 394 (La.App. 4th Cir.1986).
There is no rational basis by which to conclude that this innocuous jury request indicates an improper consideration of the defendant's right to remain silent. The general jury charge advised the jurors of the defendant's right to remain silent, the state's burden of proving all elements of the offense,[4] and cautioned the jurors from holding the defendant's silence against him, and these instructions were sufficient to cure any possible prejudice which may have resulted.

II. The abbreviated definitions of second degree murder and manslaughter
The defendant argues the jury instructions as to second degree murder and manslaughter were so incomplete as to preclude the jury's ability to properly consider manslaughter as a responsive verdict, and that his trial counsel was ineffective in failing to object to the allegedly defective jury instruction language.
The state argues the language at issue was consented to by the defendant, precluding his raising the issue on appeal, and that the language accepted reflected the evidence presented.
La. C. Cr. P. art. 801 provides:
A. The court shall charge the jury after the presentation of all evidence and arguments. The court shall reduce its charge to writing if it is requested to do so by either a defendant or the state prior to the swearing of the first witness at the trial on the merits. The court's written charge shall be read to the jury. The court shall deliver a copy thereof to the defendant and to the state prior to reading it to the jury.
B. (1) After such written charge is read to the jury, a copy of the written charge shall be delivered to the jury if such delivery is consented to by both the defendant and the state in open court but not in the presence of the jury.
(2) The lack of consent by either the defendant or the state to the delivery of the written charge to the jury shall not be communicated to the jury.
C. A party may not assign as error the giving or failure to give a jury charge or any portion thereof unless an *1035 objection thereto is made before the jury retires or within such time as the court may reasonably cure the alleged error. The nature of the objection and grounds therefor shall be stated at the time of objection. The court shall give the party an opportunity to make the objection out of the presence of the jury.
The defendant complains that the trial court erred in drastically reducing the possible listed felonies for second degree felony murder, arguing that this may have saved some time, but it created confusion with the jury as to its ability to render a responsive verdict of manslaughter. We disagree, chiefly for two reasons:
 The omissions were entirely consistent with a reasonable clarification of the legal situation; and
 The changes were agreed upon by counsel, under painstaking supervision and guidance of the trial court.
La. R.S. 14:30.1 A(2)(a), as written at the time of the offense, defined second degree murder as a homicide committed without the intent to kill or inflict great bodily harm, when the offender is engaged in the perpetration or attempted perpetration of 11 felonies: aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, drive-by shooting, armed robbery, first degree robbery, or simple robbery.[5]
In the jury instructions, the trial court, at the request and consent of the parties, limited the felonies listed in the definition of second degree felony murder to only "armed robbery." Also included in the jury instructions was a definition of armed robbery, R.S. 14:64.
Arguably, this places a higher burden on the state. For instance, the final charge neither included nor defined the crime of simple robbery, R.S. 14:65, which requires fewer elements of proof than does armed robbery, which was included and defined in the jury instruction.
The defendant points out that in the instruction relative to manslaughter, the crime was defined as a homicide committed during "any felony not enumerated under the Second Degree Murder Statute...." The defendant notes the actual language is "any felony not enumerated in Article 30 or 30.1." In explanation, there are two factors at work here:
First, at the time of the crime, the exact same 11 enumerated felonies were listed for felony murder one and felony murder two. In addition, felony murder two also included cruelty to juveniles, a distinction without a difference here, as the victim was a grown man.
Second, there are hundreds, if not thousands of other felonies other than these dozen. Defendant suggests that the incomplete jury instruction kept the jury from considering the "other felony" manslaughter option, since it was not told of all 12 enumerated felonies, and thus, would not know which were the "other felonies." Particularly, he argues that theft of $500 or more is one "other felony" by which the jury could have arrived at a felony manslaughter verdict. The simple refutation is that the judge and attorneys merely simplified the charge for the jury, to aid them in reaching a just verdict. To follow defendant's argument, not only should every enumerated felony have been listed and *1036 defined, but hundreds of other non-enumerated felonies should have been listed and defined. Defendant's suggestions would result in a jury charge lasting several hours, if not days, increasing confusion of the jury.
Unless objected to contemporaneously, an irregularity or error in the charge to the jury may not be asserted on appeal. La. C. Cr. P. art. 841; State v. Belgard, 410 So.2d 720 (La.1982); State v. Wilson, 28,403 (La.App.2d Cir.8/21/96), 679 So.2d 963. Defendant's present objection to the language of the jury instructions is 13th hour hindsight, and if granted, would allow him to have it one way at trial and another on appeal.

III. Ineffective assistance of counsel
As a general rule, a claim of ineffective assistance of counsel is more properly raised in an application for post-conviction relief in the trial court than by appeal. This is because PCR creates the opportunity for a full evidentiary hearing under La. C. Cr. P. art. 930. State ex rel. Bailey v. City of West Monroe, 418 So.2d 570 (La.1982); State v. Williams, 33,581 (La.App.2d Cir.6/21/00), 764 So.2d 1164. A motion for new trial is also an accepted vehicle by which to raise such a claim. Id.
However, when the record is sufficient, this court may resolve this issue on direct appeal in the interest of judicial economy. State v. Ratcliff, 416 So.2d 528 (La.1982); State v. Willars, 27,394 (La.App.2d Cir.9/27/95), 661 So.2d 673.
The right of a defendant in a criminal proceeding to the effective assistance of counsel is mandated by the Sixth Amendment to the U.S. Constitution. State v. Wry, 591 So.2d 774 (La.App. 2d Cir.1991). A claim of ineffectiveness of counsel is analyzed under the two-prong test developed by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
To establish that his attorney was ineffective, the defendant first must show that counsel's performance was deficient. This requires a showing that counsel made errors so serious that he was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.
The relevant inquiry is whether counsel's representation fell below the standard of reasonableness and competency as required by prevailing professional standards demanded for attorneys in criminal cases. Strickland, supra; State v. Roland, 36,786 (La.App.2d Cir.6/5/03), 850 So.2d 738; writ denied, 2003-2395 (La.2/13/04), 867 So.2d 685; State v. Moore, 575 So.2d 928 (La.App. 2d Cir.1991). A reviewing court must give great deference to trial counsel's judgment, his tactical decisions, and his trial strategy, strongly presuming he has exercised reasonable professional judgment. Roland, supra; Moore, supra.
Second, the defendant must show that counsel's deficient performance prejudiced his defense. This element requires a showing that the errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Strickland, supra. The defendant must prove actual prejudice before relief will be granted. It is not sufficient for the defendant to show the error had some conceivable effect on the outcome of the proceedings. Rather, he must show that, but for counsel's unprofessional errors, there is a reasonable probability the outcome of the trial would have been different. Strickland, supra; State v. Roland, supra; State v. Pratt, 26,862 (La.App.2d Cir.4/5/95), 653 So.2d 174, writ denied, 95-1398 (La.11/3/95), 662 So.2d 9.
*1037 The obvious problem with the defendant's ineffective assistance of counsel claim is that the other enumerated felonies listed in the second degree murder statute clearly did not fit the evidence in the case. There was no rape, arson, burglary, kidnapping, escape, or drive-by shooting. Likewise, the use of the definition of first degree robbery or simple robbery in the instructions is not necessary, as the evidence clearly shows that a defendant was armed during the robbery. Sadly, the bullet hole in the body of the victim amply proves this. The abbreviated instructions were appropriate, considering the evidence that the liquor store employee was robbed, then executed in cold blood by a killer armed with a firearm.
It is clear the trial court, prosecutor and defense counsel agreed to a streamlining of the instructions regarding both second degree murder and manslaughter for two reasons: (1) to reflect the adduced evidence, and (2) to avoid confusing the jury.
The evidence clearly shows that the defendant was killed during the crime of armed robbery. Accordingly, even if the defendant had requested that all of the enumerated felonies be listed in the instructions, the trial court could correctly have rejected the request, based on the evidence before it. State v. Gipson, 28,113 (La.App.2d Cir.6/26/96), 677 So.2d 544, writ denied, 96-2303 (La.1/31/97), 687 So.2d 402.
At appeal, defense counsel argued that justice was worth another 20 minutes of the court's time to instruct the jury in all possible details. This argument misses the boat. The issue is not the amount of time. The issue here is juror comprehension. The trial court simply made a reasonable effort to facilitate the jury's understanding of the legal requirements before them, considering the nature of the evidence and the best efforts of counsel to facilitate this end.
The defendant has not demonstrated that:
 his trial counsel erred in approving the instructions,
 but for the alleged defect in the jury instructions, the outcome would have been different, nor that
 the jury reached an unreliable verdict.

IV. The mask and related DNA evidence
The defendant argues the post-arrest DNA testing of the defendant was inadmissible because the warrant for the testing was issued without a contradictory hearing and without allowing him assistance from his counsel during the actual securing of this evidence.
The state responds that the search warrant for a DNA sample from the defendant was properly issued and no notice to the defendant's counsel or a contradictory hearing was required. The state is correct.
La. C. Cr. P. art. 703 provides, in pertinent part:
A. A defendant adversely affected may move to suppress any evidence from use at the trial on the merits on the ground that it was unconstitutionally obtained.
* * *
C. A motion filed under the provisions of this Article must be filed in accordance with Article 521, unless opportunity therefor did not exist or neither the defendant nor his counsel was aware of the existence of the evidence or the ground of the motion, or unless the failure to file the motion was otherwise excusable. The court in its discretion may permit the filing of a motion to suppress at any time before or during the trial.

*1038 D. On the trial of a motion to suppress filed under the provisions of this Article, the burden of proof is on the defendant to prove the ground of his motion, except that the state shall have the burden of proving the admissibility of a purported confession or statement by the defendant or of any evidence seized without a warrant.
E. (1) An evidentiary hearing on a motion to suppress shall be held only when the defendant alleges facts that would require the granting of relief. The state may file an answer to the motion. The defendant may testify in support of a motion to suppress without being subject to examination on other matters. The defendant's testimony cannot be used by the state except for the purpose of attacking the credibility of the defendant's testimony at the trial on the merits.
* * *
F. A ruling prior to trial on the merits, upon a motion to suppress, is binding at the trial. Failure to file a motion to suppress evidence in accordance with this Article prevents the defendant from objecting to its admissibility at the trial on the merits on a ground assertable by a motion to suppress.
Prior to trial, the state obtained a search warrant to obtain a DNA sample from the defendant. The results of the test established that the DNA in the saliva found in the stocking mask seized following the murder belonged to the defendant. The defendant did not file a motion to suppress this evidence prior to trial. Instead, only when the state attempted to offer the test results into evidence did the defendant object. The defendant argues, without citing any authority, that the trial court erred in letting the DNA evidence be introduced.
La. C. Cr. P. art. 703(C) provides that motions to suppress evidence shall be filed prior to trial in accordance with La. C. Cr. P. art. 521. La. C. Cr. P. art. 703(F) provides that, "[f]ailure to file a motion to suppress evidence in accordance with this Article prevents the defendant from objecting to its admissibility at the trial on the merits on a ground assertable by a motion to suppress." The reason for this rule is to eliminate from a jury trial the disputes over police conduct, unrelated to a defendant's guilt or innocence. This prevents unwarranted delay during the trial itself, in an effort to prevent confusion and inconvenience to the jury. In addition, the state and the defendant are spared the expense of a trial where the matter can be resolved by legal determination of constitutional issues. State v. Christian, 26,589 (La.App.2d Cir.1/25/95), 649 So.2d 806, writ denied, 95-0791 (La.9/15/95), 660 So.2d 448.
In any event, however, the defendant has made no showing that the state committed any constitutional error by obtaining a search warrant for a DNA sample without a hearing, nor by harvesting the defendant's DNA at a time when his counsel was not present.

A. Fourth Amendment argument
Such a search as here does not violate the Fourth Amendment, so long as the settings and procedures are reasonable. See, Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). Schmerber involved a warrantless blood test under exigent circumstances, in a DWI case. Here, the state properly secured a search warrant in advance of the simple procedures required to obtain this physical evidence.
Where evidence of a serious crime is sought, a request by the state for involuntary surgery upon a defendant may *1039 be considered by the magistrate. See, State v. Martin, 404 So.2d 960 (La.1981). The balancing test is whether probable cause exists that the procedure will yield material evidence, as weighed against the health and safety of the defendant. See, State v. Stephens, 2000-2472 (La.3/16/01), 782 So.2d 562.
These matters are necessarily decided on a case-by-case basis. For example, stomach pumping for the purpose of retrieving evidence has been held to "shock the conscience."[6] Mr. Moore underwent no such indignity.
Defendant also argues that a contradictory hearing should have been held before the instant search warrant issued, a proposition for which there is no jurisprudential support. Under the facts and circumstances of this murder case, the state certainly behaved reasonably in seizing this physical evidence from Moore. The Fourth Amendment was not violated. If ever an issuing magistrate violates the law by issuing an unconstitutional search warrant, another magistrate can later review and reexamine that warrant at a suppression hearing. Here, no motion to suppress was filed.

B. Fifth Amendment argument
The Fifth Amendment privilege against self-incrimination applies only to testimonial evidence, not physical evidence. See, State v. Clark, XXXX-XXXX (La.6/27/03), 851 So.2d 1055, cert. denied, ___ U.S. ___, 124 S.Ct. 1433, 158 L.Ed.2d 98 (2004). One defendant was made to utter words purportedly said by the robber, with no self-incrimination problem, as the words were not testimonial in nature. See, U.S. v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

C. Sixth Amendment argument
Defendant cites no cases in support of his complaint that his counsel was not present at the time his DNA was harvested. Nor has he advised as to what specific harm he suffered in the absence of his lawyer. The closest jurisprudence supporting defendant's position may be the requirement that a post-indictment participation in a lineup requires the presence of counsel. See, Wade, supra. We decline to pretzel ourselves so as to stretch this precept to the simple harvesting of bodily cells. The police here secured judicial approval before painlessly taking specimens from Moore's person, which was all they legally had to do.

V. Leading questions
The defendant argues the state's leading questions to Johnny Williams prevented him from having a fair trial.
La. C.E. Article 611(C) provides:
C. Leading questions. Generally, leading questions should not be used on the direct examination of a witness except as may be necessary to develop his testimony and in examining an expert witness on his opinions and inferences. However, when a party calls a hostile witness, a witness who is unable or unwilling to respond to proper questioning, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions. Generally, leading questions should be permitted on cross-examination. However, the court ordinarily shall prohibit counsel for a party from using leading questions when that party or a person identified with him is examined by his counsel, even when the party or a person identified with him has been called as a witness *1040 by another party and tendered for cross-examination.
A leading question is one which suggests the answer the witness is to give. State v. White, 254 La. 389, 223 So.2d 843 (1969); State v. Hattaway, 28,060 (La.App.2d Cir.5/8/96), 674 So.2d 380, writ denied, 96-1900 (La.1/10/97), 685 So.2d 141. Leading questions are generally not appropriate on direct examination. La. C.E. art. 611(C).
Leading questions are also not the type of prosecutorial error which diminish the reliability of a jury's verdict. State v. Felde, 422 So.2d 370, 385 (La.1982), cert. denied, 461 U.S. 918, 103 S.Ct. 1903, 77 L.Ed.2d 290 (1983); State v. Hattaway, supra. The use of leading questions is largely within the trial court's discretion, and only clear abuse which prejudices the defendant's rights will justify reversal of a conviction. State v. Felde, supra; State v. Hattaway, supra; State v. Essex, 24,781 (La.App.2d Cir.5/5/93), 618 So.2d 659.
A review of the record does not show the trial court abused its discretion in allowing the state to question Williams as it did. As pointed out by both the defendant and the state in briefs, the majority of the questions at issue resulted in yes or no answers. Questions calling for yes or no answers do not constitute impermissible leading questions where the questions do not suggest the answer that the witness is expected to give. State v. Hotoph, 99-243 (La.App. 5th Cir.11/10/99), 750 So.2d 1036, writs denied, 99-3477, 00-0150 (La.6/30/00), 765 So.2d 1062, 1066.
Even if some of the questions asked by the state of Williams were inappropriately leading, nothing in the defendant's brief indicates how those questions were the type of prosecutorial misconduct which diminishes the reliability of the jury's verdict. There is no indication that the questioning led Williams to acquiesce to any false suggestions. State v. Murray, 375 So.2d 80 (La.1979). There is also no showing that Williams testified differently than he did when confessing to the police. Additionally, the defendant's trial counsel conducted very extensive and rigorous cross-examination, challenging virtually all of this testimony.

CONCLUSION
The defendant's conviction and sentence are AFFIRMED.
APPLICATION FOR REHEARING
Before BROWN, CARAWAY, PEATROSS, DREW and LOLLEY, JJ.
Rehearing denied.
NOTES
[1] The store is usually referred to in the transcript as "Thrifty Liquor."
[2] The abandoned house was located at 314 Birch. Williams' house was located at 215 Birch. The defendant lived occasionally with his mother at 806 Washington, about four to five blocks from 314 Birch.
[3] Williams later received 30 years at hard labor, without benefit of probation, parole, or suspension of sentence.
[4] The state's burden was also exhaustively explored during voir dire.
[5] Curiously, R.S. 14:30.1 A(2)(b) adds a 12th enumerated felony, i.e., cruelty to juveniles, R.S. 14:93, to the crime of Second Degree Felony Murder. This subsection requires, as an apparent glitch, that the killing must occur during the perpetration of cruelty to juveniles. The crime of second degree murder is satisfied under R.S. 14:30.1 A(2)(a) should the killing occur during the perpetration or attempted perpetration of any of the other 11 crimes (Our emphasis).
[6] Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952).