Judgment rendered December 18, 2024.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 56,045-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

CHRISTOPHER D. RODGERS                       Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 386,031

Honorable Donald E. Hathaway, Jr., Judge

* * * * *

LOUISIANA APPELLATE PROJECT          Counsel for Appellant
By: Douglas L Harville

CHRISTOPHER D. RODGERS               Pro Se

JAMES E. STEWART, SR.                Counsel for Appellee
District Attorney

JASON W. WALTMAN
MARGARET R. GASKINS
KENDRA S. JOSEPH
Assistant District Attorneys

* * * * *

Before COX, HUNTER, and ELLENDER, JJ.

**COX, J.**

This criminal appeal arises out of the First Judicial District Court, Caddo Parish, Louisiana. Christopher D. Rodgers appeals his two convictions and sentences for two counts of molestation of a juvenile under the age of 13. The trial court sentenced Rodgers to two 99-year sentences to be served consecutively. For the following reasons, we affirm his convictions and sentences.

## FACTS

On December 2, 2021, Rodgers was charged by a bill of information for two counts of molestation of a juvenile, in violation of La. R.S. 14:81.2. On April 21, 2023, an amended bill of information was filed charging Rodgers with two counts of molestation of a juvenile under the age of 13, in violation of La. R.S. 14:81.2(A) and (D)(1). The victims in this case are B.R. (D.O.B. 2/8/2007) and K.A. (D.O.B. 5/22/2019).

Testimony began in Rodgers' jury trial on October 5, 2023. Robin Sanders testified that Rodgers is her stepbrother, and she has known him since he was three years old. She stated that although their parents were no longer married, she and Rodgers would talk occasionally. She testified that she began babysitting Rodgers' youngest child, K.A., in December of 2019 and would keep K.A. overnight for months at a time at Rodgers' request. She stated that she and Rodgers had an amicable relationship for the first two years of K.A.'s life, and she would babysit and return K.A. whenever Rodgers requested it. She testified that in July of 2021, she sought temporary custody of K.A. after Rodgers was impaired around K.A. "one too many times."

Ms. Sanders testified that when K.A. was between 1 1/2 and 2 years old, she noticed he would try to stick his finger in his bottom during diaper changes, and he was "hyper focused" on his penis. She stated that it was not like a usual diaper change where the baby tries to roll or kick, but it took two people to prevent him from getting feces on his hands. She stated that he would pull his penis out of his diaper; so, she began putting a onesie over his pants to prevent him from fondling himself. She testified that she had two children of her own and felt this behavior was not ordinary.

Ms. Sanders testified that when Rodgers brought K.A. to her to babysit, he also brought his three other children, including B.R. She stated that in August of 2021, B.R., who was 14 years old, told her that when K.A. was about one and a half, she saw Rodgers sitting on the couch with K.A., watching porn, masturbating, and manipulating K.A. to an erection. Ms. Sanders stated that on another occasion, B.R. told her that when she was younger, her dad would "bounce her on his lap and grind her and that she could feel him get to an erection," and he would touch her breasts and bottom inappropriately. Ms. Sanders testified that she reported what B.R. told her and has had full custody of K.A. since October of 2021.

On cross-examination, Ms. Sanders stated that she took K.A. to the pediatrician in August of 2021 to discuss her concerns with his behavior. She stated that even if she found out that B.R. was lying and a pediatrician said K.A.'s behavior was normal for a child born addicted to drugs, she would still have concerns.

Junior Thornton testified that he is Amanda Thornton's father and B.R.'s grandfather (Amanda is B.R.'s mother). He stated that B.R. and her sisters have lived with him since they were eight to ten years old, and he has

2

legal custody of them. When asked what prompted him to seek custody of the children, Mr. Thornton stated:

> Well, at that time back then, Chris Rodgers and my daughter, they was drinking a lot and doing drugs, but then more or less he would go out of town and more or less say that he was going to check the kids out of school and take them out of town and stuff like that. I didn't want that.

Defense counsel objected to Mr. Thornton's statement and motioned for a mistrial based on the reference to other crimes. The trial court denied the motion; it cautioned the State that it was a close call, and its witnesses should be cautioned to respond only to the questions asked.

Mr. Thornton testified that Rodgers asked him if he would keep K.A. and adopt him, but Mr. Thornton refused because of his (Mr. Thornton's) age. On cross-examination, Mr. Thornton stated that Amanda and Rodgers would argue in front of B.R., and he believed that it caused B.R. to side with Amanda.

Madison Crnkovic testified that she has known B.R. and her sisters for about ten years, and they would play together as children. She recalled a time when she was in ninth grade visiting B.R. and her sisters at Rodgers' condo. She stated that she and the girls were watching TV upstairs, she went downstairs to get a drink, and she saw Rodgers watching porn in the living room. She testified that when she saw him watching it, she took the girls and left the house.

On cross-examination, Ms. Crnkovic admitted that she told Rodgers that she did not believe B.R.'s allegations. She testified that she did believe B.R. and explained that she feared Rodgers, and he was manipulative.

B.R. testified that she was currently 16 years old and homeschooled. She stated the following regarding the molestation by Rodgers:

Well, when I was younger, like, I would say, like, 10, six, seven or eight, he would, like, put me in his lap and stuff and then move me, like, on his private area and stuff. And then there was times where, like, he would touch my butt and stuff. And, like, when he would threaten me and stuff. There's been a lot of, like, moments.

…

I thought it was normal until I got older and realized.

…

I tried telling my mom, but she didn't believe me at the time because she wasn't in her right mind.

B.R. testified that when Rodgers would act inappropriately with her on his lap, she could feel him get an erection. She stated that the inappropriate behavior ended when she was not around Rodgers anymore.

B.R. testified that K.A. is her half-brother. She stated that when she was about 14 years old, her mom took her to Rodgers' condo. She testified that when she walked in the condo, she saw Rodgers watching porn and touching K.A.'s "private spot." She stated that she asked Rodgers what he was doing, told her mom, and they took K.A. She stated that Rodgers said it was not what it looked like. B.R. testified that when she felt comfortable, she told Ms. Sanders about what happened to K.A. and herself.

The State introduced a screenshot of text messages from "Chris" to B.R. B.R. testified that those were the messages sent to her by Rodgers and read the messages to the jury. The text messages contained the following statements:

[B.R.], don't you f****** dare test me. I swear to God I'll kill you, if you're my daughter or f****** not. All you do is cause this family hell. You're the reason why your mom don't want to be with me. You're always causing drama with me and your mom. I'm tired of you, and it's time for you to get put out of your misery. You're a mistake. Nobody wants you, none of your friends or family. I'm sick and tired of you, and if I don't do that, I'll make sure you're sent away so me and your mom can be together.

On cross-examination, B.R. admitted that there were times when she and Rodgers had a bad relationship, and she usually sided with her mother when her mom and Rodgers would argue. She stated that she did not tell her grandfather "[p]robably because [Rodgers] had everyone brainwashed and no one would have probably believed me at the time." Defense counsel asked B.R. how the topic of her abuse came up when she disclosed to Ms. Sanders. She stated that Ms. Sanders told her that Rodgers would make comments about her that were sexual in nature. B.R. also stated that she felt she could trust Ms. Sanders, and Ms. Sanders would do something about it because she was not scared of anyone. She testified that she did not want to stress Mr. Thornton and add more to his plate. B.R. stated that she was clothed during each inappropriate incident.

Lacie Hadley, the Director of the Gingerbread House Children's Advocacy Center, was accepted as an expert in forensic interviewing and delayed reporting. She testified generally about delayed reporting in child abuse cases, particularly in cases where the abuser is a family member. Ms. Hadley did not testify to the specifics of this case.

Laura Sanders testified on behalf of Rodgers. She stated that she was Rodgers' mother, would watch K.A. for Robin, and had a good relationship with Robin. She testified that she received two "ugly" text messages in the past, which turned out to be from B.R. pretending to be another person.

Jamie Abbott testified that she is a good friend of Amanda's and has known Rodgers since childhood. She testified that Rodgers stayed at her apartment almost every night from April of 2020 through August of 2021 to help her out after her car was stolen.

5

Rodgers testified that he is the father of B.R. through his relationship with Amanda, and he is the father of K.A. through his relationship with Mandy Angelo. He stated that he was notified when K.A. was born that he was a possible father and could attend a child in need of care proceeding in St. Bernard Parish. He testified that K.A. was born addicted to opiates, and he was granted sole custody of K.A. in August of 2019, when K.A. was three months old. Rodgers testified that when he got custody of K.A., he tried to become a family again with Amanda and their three daughters, including B.R. He stated that when B.R. was growing up, he worked out of town all over the South and took B.R. on vacations to Six Flags or other destinations where he was working. Pictures of the family on vacations and doing family activities were admitted into evidence.

Rodgers denied fondling K.A. or touching him inappropriately; bouncing B.R. on his lap and getting an erection or attempting to arouse himself with B.R. on his lap; and touching B.R.'s breasts and bottom or molesting her in any way.

Rodgers testified that he was not made aware of the allegations against him until he went to court regarding the custody of K.A. in September of 2021. He stated that he was living with Ms. Abbott during the dates of the alleged abuse. He testified that during the alleged abuse, B.R. would text him for food, pageant dresses, Apple products, earbuds, and anything else she wanted. Rodgers stated that he would buy anything B.R. requested and take it to her. He testified that B.R. visited him before, during, and after the alleged dates of abuse.

Rodgers testified that he and Ms. Sanders had a decent relationship prior to the custody dispute over K.A. He stated that he contemplated a

limited custody arrangement with Ms. Sanders to enable her to take K.A. to the doctor and communicate with medical professionals regarding weaning K.A. off phenobarbital. He stated that he did not recall the incident that Ms. Crnkovic described and has never watched porn in the presence of the children. He also denied sending B.R. the text messages that were read for the jury.

The jury returned the verdicts of guilty as charged on both counts. The jury was polled, and it was a unanimous verdict.

Rogers filed a pro se post verdict judgment of acquittal, motion for new trial, and motion for arrest of judgment. Rodgers' counsel also filed a motion for new trial and motion for post verdict judgment of acquittal. These were all denied at a hearing on January 18, 2024, where Rodgers represented himself and his trial counsel became his stand-by counsel.

The sentencing hearing was held on January 19, 2024. Rodgers again represented himself and trial counsel was stand-by counsel. The trial court stated that there was an undue risk that during the period of a suspended sentence or probation the defendant would commit another crime, the defendant needed correctional treatment or a custodial environment that can be provided most effectively by his commitment to an institution, and a lesser sentence would deprecate the seriousness of the defendant's crime.

The trial court found the following aggravating factors to be applicable: 1) the offender's conduct during the commission of the offense manifested deliberate cruelty to the victims; 2) the offender knew or should have known that the victims of the offense were particularly vulnerable and incapable of resistance due to extreme youth; 3) the offender used his or her position or status to facilitate the commission of the offense; 4) the offender

7

used threats of or actual violence in the commission of the offense; and 5) the offense resulted in a significant permanent injury to the victim and family. The trial court did not find any mitigating factors to apply. The trial court sentenced Rodgers to two 99-year sentences at hard labor without benefits, to be served consecutively. The trial court's sentencing outline is included in the record.

After the trial court rendered its sentence, Rodgers stated that he wanted to make a statement before sentencing. The trial court allowed him to make his statement. Stand-by counsel clarified Rodgers' arguments for reconsideration of sentence. The trial court denied the reconsideration. Stand-by counsel then stated for clarification of the record, "He made a Motion to Reconsider with the certificates, but that motion was denied as well too, so he's just objecting for the record. And then, finally, Your Honor, he wants to make a motion for appeal to designate the entire record including the transcripts, exhibits, voir dire, the whole record, and to appoint the appellate project as his attorney." The trial court responded, "So ordered."

## DISCUSSION

*Insufficient Evidence*

In both the counseled brief and Rodgers' pro se brief, Rodgers argues there was insufficient evidence to convict him. He argues that B.R.'s allegations were the sole source of all evidence against him. He states that the State offered no medical expert, medical records, or any other type of scientific evidence to establish that K.A.'s conduct was indicative of sexual abuse. He highlights that B.R.'s statements were inconsistent—she reported that she saw Rodgers masturbating while manipulating K.A.'s penis and

8

watching porn, but at trial she did not include that he was masturbating. Rogers states, "This inconsistency is too great for any reasonable trier of fact to ignore." He asserts that the evidence introduced at the trial, when viewed under the *Jackson* standard, was insufficient to prove his guilt beyond a reasonable doubt.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the case in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004); *State v. Steines*, 51,698 (La. App. 2 Cir. 11/15/17), 245 So. 3d 224, *writ denied*, 17-2174 (La. 10/8/18), 253 So. 3d 797. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. *Steines, supra*.

The appellate court does not assess the credibility of witnesses or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442; *Steines, supra*. A reviewing court affords great deference to a factfinder's decision to accept or reject the testimony of a witness in whole or in part. *Steines, supra*. In the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness—if believed by the trier of fact—is sufficient to support the requisite factual conclusion. Such testimony alone is sufficient even where the State does not introduce medical, scientific, or physical evidence. This is equally applicable to the testimony of sexual assault victims. *Steines, supra*.

9

At the time of the offenses, La. R.S. 14:81.2(A)(1) provided:

> Molestation of a juvenile is the commission by anyone over the age of seventeen of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons, with the intention of arousing or gratifying the sexual desires of either person, by the use of force, violence, duress, menace, psychological intimidation, threat of great bodily harm, or by the use of influence by virtue of a position of control or supervision over the juvenile. Lack of knowledge of the juvenile's age shall not be a defense.

We find there was sufficient evidence to convict Rodgers of both offenses. B.R.'s testimony alone is sufficient evidence that Rodgers is guilty of molestation of a juvenile.

As acknowledged by Rodgers and detailed above, B.R.'s statements to Ms. Sanders were mostly consistent with B.R.'s testimony at trial, the difference being the recounting of masturbation. The jury was able to hear directly from Ms. Sanders and B.R. and determine whether they found them to be credible. The jury was also able to weigh the testimony of Rodgers, who denied ever inappropriately touching either child. In addition, Ms. Abbott testified that Rodgers stayed at her home almost nightly during the time of the incident with K.A. Rodgers also introduced photographs of B.R. around the time of her reporting the abuse to prove that she was comfortable around him, which he alleged would negate her credibility. The jury weighed the evidence and by finding Rodgers guilty as charged on both counts, found B.R. to be a credible witness. The fact that she did not mention masturbation in her testimony was not enough for the jury to question her credibility on the incidents.

As the jury's decision was reasonably based on a credibility call, Rodgers' convictions are not disturbed on appeal. This assignment is without merit.

*Prior Bad Acts*

In both the counseled brief and Rodgers' pro se brief, Rodgers argues that he did not have a fair trial because witnesses discussed his prior incarceration and drug use. He asserts that the State was able to overcome B.R.'s inconsistent and incredible testimony by improperly introducing this testimony related to his prior drug use and prior time in jail. Rogers requests that his convictions be reversed and the matter remanded.

The law regarding discretionary mistrials and admonitions is set forth in La. C. Cr. P. art. 771, which provides, in pertinent part:

> In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
> …
>
> (2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
>
> In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.

The ordering of a mistrial is a drastic remedy and, except in instances in which it is mandatory, is only warranted if substantial prejudice results which deprives defendant of a fair trial. *State v. Burdgess*, 434 So. 2d 1062 (La. 1983); *State v. Moore*, 38,444 (La. App. 2 Cir. 6/23/04), 877 So. 2d 1027, *writ denied*, 04-2316 (La. 2/4/05), 893 So. 2d 83. The trial court's

rulings with regard to trial conduct should not be disturbed absent a manifest abuse of discretion. *Id.* Trial error is harmless where the verdict rendered is "surely unattributable to the error." *State v. Johnson*, 94-1379 (La. 11/27/95), 664 So. 2d 94; *State v. Bradley*, 43,593 (La. App. 2 Cir. 10/29/08), 997 So. 2d 694, *writ denied*, 08-2997 (La. 9/18/09), 17 So. 3d 384.

We find no error in the trial court's denial of Rodgers' motions for mistrial. On cross-examination, Rodgers' counsel repeatedly asked Ms. Sanders if Rodgers was present for the July 2021 emergency custody hearing of K.A. Counsel stated, "You indicated he was supposed to be, but isn't it true – and this is important for the jury – isn't it true he was not present for that hearing?" Counsel then asked if Rodgers was present for the October 21, 2021, hearing, and Ms. Sanders stated that he was not at that hearing either.

Then, on redirect, the following exchange occurred between the State and Ms. Sanders:

> Q. Now, you testified that the defendant was not present on that July 21st hearing --
> A. That's correct.
> Q. -- do you know where he was?
> A. Asleep.
> …
> Q. Okay. And then you testified he wasn't present at the October 21 hearing?
> A. That's right.
> Q. Do you know where he was?
> A. Yes.
> Q. Where was he? Where was he?
> A. He was in Caddo Correctional.

Defense counsel made an issue about Rodgers not being at the custody hearings when custody was given to Ms. Sanders. He stated that it was "important for the jury" to know that Rodgers was not present. The trial

court stated that it was clear that Counsel was trying to show that Ms. Sanders obtained custody without Rodgers being present. Therefore, Counsel opened the door for the State to clarify why Rodgers was not present. We do not find that the trial court abused its discretion in denying this motion for mistrial.

The State questioned Mr. Thornton as to why he sought legal custody of B.R. and her sisters. He responded, "Well, at that time back then, [Rodgers] and my daughter, they was drinking a lot and doing drugs[.]" We agree with the State that this statement does not indicate Rodgers was doing illegal drugs—people are prescribed prescription drugs. The trial court's denial of a mistrial under these circumstances is not an abuse of discretion.

As discussed above, the testimony presented at trial was sufficient for the jury to find Rodgers guilty. Therefore, the complained-of statements made by Ms. Sanders and Mr. Thornton did not contribute to the verdict. Additionally, Rodgers later testified to his previous convictions, including drug-related convictions. This assignment of error is without merit.

*Excessive Sentence*

Rodgers argues that the maximum, consecutive sentences of 99 years of imprisonment on each count is excessive. He states that while his crimes of conviction are serious, the record fails to show that he is the worst of the worst. He highlights that the district court sentenced him without ordering a presentence investigation report ("PSI"). He requests that his sentences be reversed.

The law concerning excessive sentences is well-settled; claims are reviewed by examining whether the trial court adequately considered the guidelines established in La. C. Cr. P. art. 894.1, and whether the sentence is

constitutionally excessive. *State v. Vanhorn*, 52,583 (La. App. 2 Cir. 4/10/19), 268 So. 3d 357, *writ denied*, 19-00745 (La. 11/19/19), 282 So. 3d 1065. A review of the sentencing guidelines does not require a listing of every aggravating or mitigating circumstance. *Id*. The goal of Art. 894.1 is to articulate an adequate factual basis for the sentence, not to achieve rigid or mechanical compliance with its provisions. *State v. Lanclos*, 419 So. 2d 475 (La. 1982); *State v. West*, 53,526 (La. App. 2 Cir. 6/24/20), 297 So. 3d 1081. There is no requirement that any specific factor be given any particular weight at sentencing. *State v. Taves*, 03-0518 (La. 12/3/03), 861 So. 2d 144; *State v. Grant*, 55,592 (La. App. 2 Cir. 4/10/24), 384 So. 3d 1159.

A sentence violates La. Const. art. I, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. *State v. Efferson*, 52,306 (La. App. 2 Cir. 11/14/18), 259 So. 3d 1153, *writ denied*, 18-2052 (La. 4/15/19), 267 So. 3d 1131. To constitute an excessive sentence, a reviewing court must find that the penalty is so grossly disproportionate to the severity of the crime as to shock the sense of justice or that the sentence makes no reasonable contribution to acceptable penal goals and, therefore, is nothing more than the needless imposition of pain and suffering. *Id*.; *State v. Griffin*, 14-1214 (La. 10/14/15), 180 So. 3d 1262. The trial court has wide discretion in the imposition of sentences within the statutory limits and such sentences should not be set aside as excessive in the absence of a manifest abuse of that discretion. *Id*.; *State v. Trotter*, 54,496 (La. App. 2 Cir. 6/29/22), 342 So. 3d 1116. As a general rule, maximum or near-maximum sentences are reserved for the worst offenders and the worst offenses. *State*

*v. Cozzetto*, 07-2031 (La. 2/15/08), 974 So. 2d 665. On review, an appellate court does not determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion. *Id*.; *Grant, supra*; *State v. McKeever*, 55,260 (La. App. 2 Cir. 9/27/23), 371 So. 3d 1156, *writ denied*, 23-01429 (La. 4/16/24), 383 So. 3d 149.

A PSI report is an aid to help the court, not a right of the defendant, and the court is not required to order a PSI. La. C. Cr. P. art. 875; *State v. Braden*, 55,275 (La. App. 2 Cir. 9/27/23), 372 So. 3d 900, *writ denied*, 23-01428 (La. 4/9/24), 382 So. 3d 830. La. R.S. 14:81.2(D)(1) provides:

> Whoever commits the crime of molestation of a juvenile when the victim is under the age of thirteen years shall be imprisoned at hard labor for not less than twenty-five years nor more than ninety-nine years. At least twenty-five years of the sentence imposed shall be served without benefit of probation, parole, or suspension of sentence.

The trial court has broad discretion in the imposition of sentences. Although the trial court did not order a PSI, it is not required to do so. During the trial, the trial court heard testimony regarding Rodgers' history. Rodgers testified to his criminal record and work history.

At sentencing, the trial court weighed the evidence and sentencing factors. The trial court stated, "[A] lesser sentence would deprecate the seriousness of the defendant's crimes. The defendant's conduct manifested… extreme cruelty to the young victims." The victims were under 13 years of age at the time of the offenses, and as their father, Rodgers exercised control over them. The trial court properly considered the aggravating factors and outlined the five factors it found to have applied, as detailed above. The trial court also considered the mitigating factors and

15

found that none applied. Although a maximum sentence, it falls within the sentencing range.

This is a case of a father convicted for molesting two of his natural children. In addition to the evidence for the crimes, the trial court heard testimony from Rodgers regarding his prior convictions. As a reviewing court, we do not determine whether another sentence would have been more appropriate. Although we may not have given these sentences, the trial court's reasons for sentencing are sufficient to uphold the sentence. We do not find that the trial court abused its discretion in sentencing Rodgers to the maximum sentences.

Where convictions stem from separate incidents involving different victims and occurring over a lengthy period of time, the resulting consecutive penalties will not be found to be an abuse of discretion. *State v. Bailey*, 50,097 (La. App. 2 Cir. 9/30/15), 180 So. 3d 442. Rodgers was convicted of molesting his two children during two different periods of time. Therefore, his consecutive sentences are not an abuse of the trial court's discretion. We find Rodgers' assignment of error as to the excessiveness of his sentences to be without merit and affirm both of his sentences.

*Admissibility of Evidence*

Rodgers argues pro se that the trial court abused its discretion by ruling cell phone evidence to be admissible without requiring the State to authenticate the text messages. He asserts that the text messages were not properly authenticated under La. C.E. arts. 104 and 901.

Authentication or identification of evidence is required for that evidence to be admissible at trial. La. C.E. art. 901. Authentication is a condition precedent to admissibility that is satisfied by evidence sufficient to

16

support a finding that the matter in question is what its proponent claims. *State v. Lee*, 01-2082 (La. App. 4 Cir. 8/21/02), 826 So. 2d 616, *writ denied*, 02-2549 (La. 9/5/03), 852 So. 2d 1019. Generally, the standard applied by state and federal courts with respect to the authentication of a document is whether there is sufficient evidence from which a reasonable juror could find that the proposed evidence is what the proponent claims it to be. *State v. Harris*, 52,541 (La. App. 2 Cir. 2/27/19), 266 So. 3d 953, *writ denied*, 19-00611 (La. 9/17/19), 279 So. 3d 380.

Louisiana courts have allowed text messages to be authenticated by the recipient of the texts. *See Harris, supra*; *State v. Haydin*, 17-234 (La. App. 5 Cir. 12/20/17), 235 So. 3d 1293, *writ denied*, 18-0114 (La. 10/29/18), 254 So. 3d 701.

B.R. testified that the message came from Rodgers, and she responded to the message. She confirmed that it had not been changed in any way. At trial, defense counsel conceded that if the trial court admitted the text message, the weight and credibility of the text message would be determined by the jury. On cross-examination, B.R. stated that the screenshot showed the contact she had saved for Rodgers, and she was not questioned further on the issue. Although Rodgers denied sending the text message to B.R., the jury could reasonably find that he sent the text message based on B.R.'s testimony. Accordingly, this assignment of error lacks merit.

*Motion for New Trial*

Rodgers argues pro se that he was entitled to a new trial based on newly discovered evidence regarding victim and witness credibility. He asserts that the trial court abused its discretion in denying his motion for new trial. Rodgers states that he attached an affidavit, testimony, and this Court's

17

opinion from his custody case with Ms. Sanders. In his motion for new trial, he does not reference these documents, only that there was new and material evidence not discovered before or during trial.

A ruling on a motion for new trial rests within the sound discretion of the trial judge. *State v. Brisban*, 00-3437 (La. 2/26/02), 809 So. 2d 923. In ruling on the motion, the trial judge's duty is not to weigh the new evidence as though he were a jury determining guilt or innocence; rather his duty is the narrow one of ascertaining whether there is new material fit for a new jury's judgment. *State v. Tubbs*, 52,417 (La. App. 2 Cir. 11/20/19), 285 So. 3d 536, *writ denied*, 20-00307 (La. 7/31/20), 300 So. 3d 404, *on recons.*, 20-00307 (La. 9/8/20), 301 So. 3d 30, and *writ denied*, 20-00307 (La. 9/8/20), 301 So. 3d 30.

The denial of a motion for new trial is not subject to appellate review except for error of law. La. C. Cr. P. art. 858. The decision on a motion for new trial rests within the sound discretion of the trial court. *State v. Horne*, 28,327 (La. App. 2 Cir. 8/21/96), 679 So. 2d 953, *writ denied*, 96-2345 (La. 2/21/97), 688 So. 2d 521. The appellate court will not disturb this ruling on appeal absent a clear showing of abuse. *Id*.

The appeal of Rodgers' custody case with Ms. Sanders was rendered on December 14, 2022, and Rodgers' criminal trial began on October 5, 2023. Any information from the custody dispute was discoverable prior to trial. The custody dispute was discussed at trial, and the Louisiana Supreme Court's writ denial in that case was submitted into evidence. We find no error in the trial court's judgment denying the motion for new trial. This assignment of error lacks merit.

18

## CONCLUSION

For the reasons stated above, Christopher D. Rodgers' convictions and sentences are affirmed.

**AFFIRMED.**